## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO:** _____ |
| **v.** | : | **DATE FILED:** _____ |
| **TIMOTHY MILLER** | : | **VIOLATIONS:** |
| | : | **18 U.S.C. §666(a)(1)(B) (federal program bribery - 1 count)** |
| | : | **18 U.S.C. §2 (Aiding and Abetting)** |
| | : | **Notice of forfeiture** |

### INFORMATION

### COUNT ONE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

All dates and times in this information are alleged to be "on or about" the specific date stated.

At all times material to this information:

1.   The National Railroad Passenger Corporation ("NRPC," hereinafter, "Amtrak") was created by Congress in 1970 to take over the passenger rail services previously required to be operated by private railroad companies in the United States.   Amtrak is a federally-chartered corporation, with the Federal government as majority stockholder. The Board is appointed by the President of the United States and confirmed by the U.S. Senate, and Amtrak is operated as a for-profit company, rather than a public authority.

1

2.     The Federal Railroad Administration ("FRA"), an agency within the United States Department of Transportation, executes and oversees grant agreements with Amtrak to provide Amtrak with federal funds appropriated by Congress.   In conjunction with operating revenues and funds from states, local governments, and other entities, Amtrak uses federal funds for a wide range of its operating and capital activities, including a portion of its operating expenses, capital maintenance of fleet and infrastructure, capital expansion and investment programs, and capital debt repayment.   The Department of Transportation, through its annual budget submission, and Amtrak, through its annual Grant and Legislative Request, provide Congress with recommended appropriation amounts.

3.     Defendant TIMOTHY MILLER was a Lead Contract Administrator at Amtrak's Procurement & Logistics Department ("Procurement"), in Philadelphia, Pennsylvania, in the Eastern District of Pennsylvania.   As a Lead Contract Administrator, Miller was responsible for procuring equipment and services, as well as, managing the account for Amtrak diesel and locomotive seat cushion vendors.   As a Lead Contract Administrator, defendant MILLER was an agent of Amtrak, an organization that receives federal funds and assistance in excess of $10,000 annually.

4.     Company 1 is a small manufacturing company headquartered in Milford, Delaware. Company 1 manufactures products which include carpet refurbishment, seating for mass transit, including the Washington Metro Transit Authority (WMATA), North Carolina Department of Transportation, and the Massachusetts Department of Transportation.   Company 1 also manufactures airplane parts, including seats, plugs and covers for military aircraft, seats, missile and truck covers, and pharmaceutical supplies.   Prior to defendant TIMOTHY MILLER's

2

employment with Amtrak, Company 1 was not an approved vendor in Amtrak's "qualified vendor catalog."

5.    Executive 1 was a Vice President for Marketing and Contract Administration at Company 1.   At the time defendant TIMOTHY MILLER was hired by Amtrak, Executive 1 was Director of Marketing & Contract Administration at Company 1.   After defendant MILLER was successful in his efforts to add Company 1 to Amtrak's "qualified vendor catalog," Company 1 became the sole supplier of seat cushions for Amtrak's passenger trains.   After Company 1 became Amtrak's sole supplier of seat cushions, Company 1 elevated Executive 1 to the position of vice president.

6.    Executive 2 was the Executive Vice President and Chief Financial Officer at Company 1.   Executive 2 was employed by Company 1 for approximately ten years and was responsible for the financial policies, procedures, control, and internal reporting systems at Company 1. Executive 2 exercised oversight of cost analysis, production, product development, sales and marketing initiatives for the company.

### Company 1 as a Vendor to Amtrak

7.    In June 2014, Amtrak – through defendant TIMOTHY MILLER - approved Company 1 as a vendor and seat cushion supplier.   Subsequently, through defendant MILLER's efforts, Amtrak awarded Company 1 contracts for:   1.) the cutting of carpet for installation in Amtrak railcars ("Carpet Contract"); 2.) the manufacture of New Seat Cushions ("New Seat Cushions Contract"); 3.) the Return and Recover contract ("R&R Contract), which involves the refurbishment of seat cushions; and, 4.) the Amfleet Refresh Carpet Contract.

3

8.     Defendant TIMOTHY MILLER, as the Contracting Official for Amtrak, was responsible for compiling, reviewing, and comparing the vendor bid submissions for each Amtrak contract within his portfolio including equipment and services.

9.     Defendant TIMOTHY MILLER recommended to his superiors at Amtrak that Company 1 be selected for all four contract awards because – according to defendant MILLER - Company 1 was the lowest bidder in each instance. The first three contracts were for a one-year period, with an option to renew for four additional one-year periods.   The fourth contract was for a one-rear renewal with a one-year option to renew.

### Miller's Acts Influenced by Bribes and Kickbacks

### Qualifying Company 1 as an Amtrak Vendor

10.     Specifically, in or around November 2013, defendant TIMOTHY MILLER requested that Amtrak qualify and approve Company 1 as a new seat cushion vendor.   Defendant MILLER sought to expedite the approval process by having another Amtrak employee prepare and submit the necessary form to initiate Company 1's vendor qualification.

### Awarding Contracts to Company 1

11.     On August 1, 2015, Amtrak awarded Company 1 the Carpet Contract in the amount of $1,730,000.

12.     On January 15, 2016, Amtrak awarded Company 1 the New Seat Cushions Contract in the amount of $3,773,949.

13.     On February 1, 2016, Amtrak awarded Company 1 the R&R Contract in the amount of $900,000.

14. On July 1, 2017, Amtrak awarded Company 1 the Amfleet Refresh Carpet Contract in the amount of $1,249,021.80.

### Submitting Bills from Company 1 for Work by Amtrak Engineers

15. As part of Amtrak's supplier qualification process, a vendor must submit drawings/designs of each part it intends to be qualified to supply.   The expenses associated with the drawings/designs are typically the vendor's responsibility and considered to be a part of doing business with Amtrak.

16. Company 1's initial drawings submitted during the qualification process were very poor.  Amtrak personnel were tasked with bringing the quality of the drawings up to acceptable standards and spent hundreds of hours working directly with Company 1 to improve the quality of their submissions.

17. After Amtrak had expended significant resources with Company 1 improving Company 1's drawings and submission materials, defendant TIMOTHY MILLER submitted to Amtrak on behalf of Company 1 two invoices ($35,914.17 and $29,943.56, respectively) to cover the cost of Company 1's drawing/designs, and associated travel.  Defendant MILLER did not submit similar invoices on behalf of Company 1's competitor in the bidding process, another vendor who was going through the new supplier qualification process for the same seat cushions contract.  Amtrak paid the first invoice in the amount of $35,914.17.

### Making Company 1 the "Sole Source" of Seat Cushions

18. Although Company 1 had to compete with other vendors for the Amtrak seat cushion contract, defendant TIMOTHY MILLER awarded the contract solely to Company 1 as the "low bidder."  Historically, it was unusual for Amtrak to award the entire contract to a single vendor

5

as in the past Amtrak had preferred to have a pool of suppliers available in the event there were problems obtaining replacement cushions as needed.

### Company 1's Performance

19.   After defendant TIMOTHY MILLER secured Amtrak's commitment to award contracts to Company 1, Amtrak discovered that Company 1 had mislead Amtrak about materials it used to manufacture assembly-line seat cushions.   During the bidding process overseen by defendant MILLER, when Company 1 submitted prototype seat cushions to Amtrak for approval, it used molded foam pursuant to Amtrak specifications.   However, when Company 1 actually manufactured the seat cushions later, Company 1 used a cheaper foam that did not meet Amtrak specifications.

20.   After defendant TIMOTHY MILLER steered Amtrak's New Seat Cushion contract to Company 1, Amtrak personnel began to receive complaints from other Amtrak employees about the quality of Company 1's cushions.   The cushions produced by Company 1 did not match the specifications in the drawings submitted during the qualifying process and also did not fit the Amtrak passenger car seats.   An Amtrak engineer obtained a sample cushion from Company 1 and learned that the shape and density of the cushions failed to meet the agreed upon specifications.   Company 1's cushions were also missing stitching and glue needed to secure the cushions.   Amtrak quarantined all of the cushions supplied by Company 1 to inspect them for compliance.   Amtrak subsequently determined that some of the cushions were compliant with the contract specifications and many were not.

21.    Despite these issues with Company 1, in late 2016, defendant TIMOTHY MILLER requested that Amtrak management waive required inspections of Company 1's seat cushions so that defendant MILLER could award Company 1 six additional purchase orders.

### Communicating About and Concealing the Corrupt Arrangement

22.    Defendant TIMOTHY MILLER created a "business" called Miller Consulting which was assigned an Employer Identification Number ("EIN") number by the Internal Revenue Service on January 25, 2016.

23.    On or about February 24, 2016, defendant TIMOTHY MILLER - using his Amtrak email address - transmitted a blank invoice in the name of "Miller Consulting" to Executive 1 at Executive 1's email address at Company 1 for "Supply chain and logistics Services" with the message, "What do you think?"

24.    On or about February 24, 2016, Executive 1, using his Company 1 email address, sent an email to Executive 2, at his Company 1 email address, forwarding the blank invoice from defendant TIMOTHY MILLER for approval from Executive 2.

25.    That same day, Executive 2 replied in an email by writing, "Invoice looks fine. However, let's make the business more legit by covering the arrangements with a Contract. Attached is a simple template which please fill up the information as applicable."

26.    Next, Executive 1 forwarded the above email composed by Executive 2 to Defendant TIMOTHY MILLER with the message:   "See [Executive 2's] comments below big guy!"

27.    Defendant TIMOTHY MILLER, "doing business" as Miller Consulting - in violation of Amtrak's internal policies - signed a contract with Executive 1 and Company 1.

7

28.   On or about February 24, 2016, defendant TIMOTHY MILLER sent an email to Executive 1 attaching the contract between defendant MILLER's consulting company and Company 1.   According to the contract, MILLER would be providing "Supply Chain and Logistical Services" to Company 1.

29.   Upon receipt, Executive 1 forwarded defendant TIMOTHY MILLER's contract via email to Executive 2 for his review.

30.   Later, Executive 1 emailed the signed contract to defendant TIMOTHY MILLER and Executive 2.

31.   That same day, defendant TIMOTHY MILLER emailed a checking account number and bank routing number to Executive 1 and Executive 2.

32.   In response, Executive 1 sent the following message to defendant TIMOTHY MILLER:   "Bam!"

33.   On or about March 4, 2016, defendant TIMOTHY MILLER sent Executive 1 a corrected bank account number.

34.   Defendant TIMOTHY MILLER used his Amtrak-issued computer to create, transmit, and/or store multiple "Miller Consulting" invoices addressed to Executive 1 at Company 1 which were all for "supply chain and logistics services" defendant MILLER purportedly "performed" in 2016 while defendant MILLER was a full-time employee of Amtrak and Amtrak's point of contact with Company 1.   Specifically, MILLER prepared invoices for the following:

| Company Name | Date of Invoice | Amount |
|---|---|---|
| Miller Consulting | February 16, 2016 | $1,433.39 |
| Miller Consulting | March 30, 2016 | $2,304.27 |
| Miller Consulting | April 27, 2016 | $929.96 |
| Miller Consulting | May 27, 2016 | $1,817.12 |
| Miller Consulting | September 2, 2016 | $1,294.75 |
| Miller Consulting | October 5, 2016 | $2,603.70 |

35.    On or about July 8, 2016, Executive 1 sent the following email to defendant TIMOTHY MILLER: "Critical that [Company 1] maintain the Amtrak contracts.  The demand for the [airplane] parts that we provide [to another government agency] will experience a significant decrease over the next few years.  This is our cash cow.  With that reduction, it is even more important that we maintain Amtrak.   Whatever I need to do - I will do it."

36.    On or about March 16, 2017, Executive 1 sent an email to defendant TIMOTHY MILLER titled, "Invoice Dated 8/4/15 MILLER."   In the email, Executive 1 wrote:   "Can you [defendant MILLER] create an invoice dated 8/4/15 for a cash payment in the amount of $7500. Going through a financial audit and need something for this payment I made to you.   You can indicate it was for consulting services, etc."

37.    That same day, defendant TIMOTHY MILLER emailed the requested invoice to Executive 1.

38.    In response, Executive 1 emailed defendant TIMOTHY MILLER and wrote, "Thanks babes."

9

39.   On or about May 30, 2017, Executive 1 received an email from another Amtrak Contract Administrator in which Executive 1 was informed that Company 1 would not be awarded an Amtrak contract outside of defendant TIMOTHY MILLER's portfolio.   Within minutes, Executive 1 forwarded the email to defendant MILLER with the message:   "Can you access the other pricing?   This is BS."

## Things of Value Received by Defendant TIMOTHY MILLER

40.   In return for steering Amtrak contracts to Company 1, Executive 1 and Executive 2 provided the following things of value to defendant TIMOTHY MILLER:

### Cash or other Monetary Compensation

| Date of Payment Authorized by Executive 1 and Executive 2 from Company 1 to Defendant TIMOTHY MILLER | Amount |
|---|---|
| August 4, 2015 | $7,500 |
| March 10, 2016 | $1,433.39 |
| April 7, 2016 | $2,304.27 |
| April 29, 2016 | $929.96 |
| June 3, 2016 | $1,817.12 |
| September 9, 2016 | $1,294.75 |
| October 17, 2016 | $2,603.70 |
| November 21, 2016 | $1,269.35 |
| December 18, 2016 | $890.24 |
| **Total** | **$20,042.78** |

10

**Trips, Entertainment or Other Compensation**

| **Approximate Date of Weekend Trip** | **Destination** |
| --- | --- |
| October 2015 | Rehoboth Beach, Delaware |
| April 2016 | Rehoboth Beach, Delaware |
| July 2016 | Rehoboth Beach, Delaware |
| September 2016 | Rehoboth Beach, Delaware |
| September 2017 | Rehoboth Beach, Delaware |

41.    Defendant TIMOTHY MILLER was also a District Team Leader for a US-based life insurance and financial services company.   Pursuant to the corrupt arrangement with Executive 1 and Executive 2 at Company 1, during the corrupt scheme, defendant MILLER was attempting to set up a meeting in order to give financial seminars to Company 1's employees with Executive 1's blessing.

42.    Executive 1 also purchased a life insurance policy and a Roth Individual Retirement Account ("IRA") from defendant TIMOTHY MILLER.   Defendant MILLER's activities in his role as a District Team Leader for an outside financial services company and an Amtrak vendor were in violation of Amtrak's Ethical Conduct and Conflict of Interest Policy, P/I No. 1.3.5.

11

43. From in or around January 2016 through December of 2016, in Philadelphia, in the
Eastern District of Pennsylvania, and elsewhere, defendant

**TIMOTHY MILLER**

corruptly solicited, demanded, accepted and agreed to accept things of value from Executive 1,
Executive 2, and Company 1, intending to be influenced and rewarded in connection with a
transaction and series of transactions of Amtrak involving $5,000 or more.

In violation of Title 18, United States Code, Section 666 (a)(1)(B) and 2.

## NOTICE OF FORFEITURE

## THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

1.     As a result of the violation of Title 18, United States Code, Section

666(a)(1)(B), set forth in this information, defendant

## TIMOTHY MILLER

shall forfeit to the United States of America any property, real or personal, that constitutes or is

derived from proceeds obtained, directly or indirectly, as a result of such violation, including, but

not limited to, the sum of $20,042.78.

2.     If any of the property subject to forfeiture, as a result of any act or

omission of the defendant:

> (a)     cannot be located upon the exercise of due diligence;
>
> (b)     has been transferred or sold to, or deposited with, a third party;
>
> (c)     has been placed beyond the jurisdiction of the Court;
>
> (d)     has been substantially diminished in value; or
>
> (e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 981(a)(1),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).


**WILLIAM S. McSWAIN**
**UNITED STATES ATTORNEY**